**UNITED STATES of America, Appellant,**

v.

**Marvin SHURBET et ux., Appellees.**
**No. 20972.**

United States Court of Appeals
Fifth Circuit.

June 7, 1965.

Louis F. Oberdorfer, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Atty., Dept. of Justice, John B. Jones, Jr., Acting Asst. Atty. Gen., Dept. of Justice, Michael A. Mulroney, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., H. Barefoot Sanders, U. S. Atty., Dallas Tex., for appellant.

Edwin L. Kahn, John J. Sexton, Washington, D. C., George W. McCleskey, Clarence P. Brazill, Jr., Lubbock, Tex., J. Chrys Dougherty, Austin, Tex., for appellees.

Before HUTCHESON and RIVES, Circuit Judges, and GROOMS, District Judge.

RIVES, Circuit Judge.

The question presented is whether, on their income tax returns for the year 1959, the taxpayers are entitled to a cost depletion deduction for the exhaustion of their capital investment in the ground water extracted and disposed of by them in their business of irrigation farming. We affirm the judgment of the district court which answered that question in the affirmative.

The case was carefully and elaborately tried as a test case for the irrigation farmers in the Southern High Plains of Texas and New Mexico. It comes to this Court on a printed record of more than 1700 pages plus many voluminous exhibits. The district court made detailed and meticulously careful findings of fact which we are requesting it to have published. 242 F.Supp. 736. The full findings are important because the decision of this case is not meant to furnish a precedent as to the allowance of cost depletion for ground water, except under the peculiar conditions of the Southern High Plains. For an understanding of the case, we must restate a considerable part of the findings of the district court.

The Southern High Plains is a plateau about 150 miles wide from east to west and 200 miles wide from north to south, with an area of approximately 35,000 square miles, situated in Texas and New Mexico. Underlying the Southern High Plains is the Ogallala formation, a geologic formation composed of interbedded layers of quartz, sand, pebbles, silt, gravel, water, clay, rocks, and other similar materials. Water suitable for human consumption, for stock watering and for irrigation purposes occurs in the voids between the mineral particles which compose the formation. The formation is permeable, that is, water can move through the materials. There has been water in the formation since it was deposited millions of years ago.

During Pliocene times, from one to ten million years ago, streams flowing eastward from the Rocky Mountains deposited the materials and water which make up the Ogallala formation. Later some of the formation was eroded away; the Canadian River carved out a valley to the north; the Pecos River turned south and carved out a valley to the west. The present boundaries on three sides of the Southern High Plains and of the Ogallala formation are: the escarpment, or steep cliff, cut by the Canadian River on the north, the escarpment cut by the Pecos River on the west, and an escarpment on the east. On the south the Ogallala formation slopes southeastward into older formations which lie at a lower elevation. The thickness of the Ogallala formation in the Southern High Plains ranges from a few feet to several hundred feet. The top of the Ogallala water table ranges from 50 to 250 feet below the surface of the land. Both the land surface and the bottom of the Ogallala formation in the Southern High Plains slope from northwest to southeast at an average rate of about 10 feet per mile.

Underlying the entire Ogallala formation in the Southern High Plains are the "red beds" several thousand feet thick and relatively impermeable, so that water does not percolate downwards to any appreciable degree. The general direction of movement of water through the Ogallala reservoir is from the northwest to the southeast at the rate of approximately 60 to 200 feet per year.

The only source from which new water of any kind can move into the Ogallala formation in the Southern High Plains is from precipitation upon the surface of the ground. Under natural conditions, prior to pumping the Ogallala reservoir was in a state of dynamic equilibrium; that is, the average annual natural recharge was approximately equal to the average annual natural discharge.

The advent of irrigation farming on the Southern High Plains occurred since 1934, at which time there were only 620 wells pumping water from the entire Ogallala reservoir. By 1948 that number had increased to 8,000, and by 1958 to 47,000.

The recoverable water in storage in the entire Ogallala formation in the Southern High Plains in 1938, 1958 and 1962 was approximately as follows:

| Year | Recoverable Water in the Ogallala Reservoir |
|------|---------------------------------------------|
| 1938 | 250 million acre-feet |
| 1958 | 220 million acre-feet |
| 1962 | 210 million acre-feet |

The taxpayers' irrigation farm consists of 480 acres of which 380 acres were purchased on August 8, 1946 for $38,000 and 100 acres were purchased on January 23, 1953 for $28,000. The district court found that of the $38,000 paid for the 380 acres, $9,500 ($25 per acre X 380 acres) was consideration for the acquisition of irrigation water. The court also found that of the $28,000 paid for the 100 acres, $12,000 ($120 per acre X 100 acres) was consideration for the acquisition of irrigation water.

Present pumping practices of farm owners and operators engaged in the business of irrigation farming in the Southern High Plains are, and for many years have been, to pump all of the ground water they can get, or all the

ground water that they think they need for their crops, whichever is less.

During 1959, taxpayers pumped ground water on their crops approximately as follows:

| Crop | Acreage | Amount of Ground Water (inches) | Acre-Feet Pumped Min.—Max. | |
|------|---------|---------------------------------|------|------|
| Cotton | 140 | 15–18 | 175 | 210 |
| Grain Sorgumn | 55–70 | 15–18 | 70 | 105 |
| Wheat | 155 | 11–13 | 143 | 169 |
| Alfalfa | 45–50 | 11–13 | 43 | 52 |
| Corn | 45–50 | 15–18 | 50 | 75 |
| TOTALS | | | 481 | 611 |

The saturated thickness under taxpayers' 380 acres at the time of purchase in 1946 was 342 feet. The saturated thickness under taxpayers' 100 acres at the time of purchase in 1953 was 332 feet.

The court further found:

"(h) In 1959 plaintiffs' depletion amounted to 5.90/342 of their $9,500 cost basis in the ground water beneath the 380-acre tract and 5.90/332 of their $12,000 cost basis in the ground water beneath the 100-acre tract.

"(i) Plaintiffs are entitled to a depletion deduction for the taxable year 1959 of $163.90, with respect to the 380-acre tract, and $213.29, with respect to the 100-acre tract, for a total cost depletion deduction of $377.18.

"(j) The allowance of the said depletion deduction would reduce the plaintiffs' income tax liability for 1959 by the amount of $113.16. Plaintiffs have overpaid their Federal Income Tax for 1959 by $113.16."

The government attacks some of the findings of the district court as clearly erroneous, or as including erroneous concepts of law. It insists that the taxpayers did not have an ownership interest in the water which was being pro tanto exhausted as the water was pumped for irrigation purposes. Further, it argues that the taxpayers have not shown that their capital investment in the land has been diminished by pumping water from beneath the land.

■ In Texas the common law rule prevails that the owner of the land owns the soil and the percolating water which is a part of the soil. Houston & Texas Ry. Co. v. East, 1904, 98 Tex. 146, 81 S.W. 279. More specifically, a Texas statute has recognized that the ownership of underground water in the Ogallala formation is vested in the owners of the land. Vernon's Texas Civil Statutes, Art. 7880–3c. The careful and thorough evidentiary development of the taxpayers' case furnished ample support for each of the findings of the district court.

■ The government's principal attack, however, is based on its contention that, as a matter of law, water is not a "natural deposit" as that term is used in Section 611 of the Internal Revenue Code of 1954, which provides in part:

"§ 611. *Allowance of Deduction for Depletion.*

"(a) *General Rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in

each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate."

The main thrust of the government's argument is that ordinary ground water is not a "natural deposit" for cost depletion purposes. In that connection, we would confine the holding in this case to the water extracted by taxpayers from the Ogallala formation in the Southern High Plains. We agree with the finding of the district court that:

> "Ground water in the Ogallala formation of the Southern High Plains is a mineral and a natural deposit within the meaning of the federal tax statutes and regulations governing deductions for cost depletion."

The government insists that throughout the years since 1913, the natural deposits on which depletion was allowed have been consistently equated with mineral deposits from which income is derived through severance and sale of the mineral as a mineral. We think that argument applies with greater force to percentage depletion now allowed as an alternative basis for computing depletion allowance in the case of nearly all minerals.

Percentage depletion looks to the gross income from the production of the mineral and may well apply only to minerals which are commercially exploited by sale. Even percentage depletion has been applied to a taxpayer who mines a mineral which it owns and processes it into a product which it sells. United States v. Cannelton Sewer Pipe Company, 1960, 364 U.S. 76, 89, 80 S.Ct. 1581, 4 L.Ed. 2d 1581; United States v. Henderson Clay Products, 5 Cir. 1963, 324 F.2d 7; United States v. Longhorn Portland Cement Co., 5 Cir. 1964, 328 F.2d 491. The present case, however, is based entirely upon cost depletion.

██ The term "natural deposits" must, of course, be interpreted consistently with the policy and purpose of Congress in allowing the depletion de-

duction. The Income Tax Law of 1913, c. 16, 38 Stat. 114, 166, sec. II provided the first specific depletion deduction based on cost or March 1, 1913 value, "not to exceed, in the case of mines, 5 per centum of the gross value at the mine of the output for the year for which the computation is made." Of course, in the usual case, "the gross value at the mine of the output" would be established by the market price or sale price of the output. The statute did not, however, require a sale or deny depletion in the unusual case where value might be established by means other than sale or market price.

The Revenue Act of 1916, c. 463, 39 Stat. 756, sec. 5, made no reference to "natural deposits" but "in the case of mines" allowed "a reasonable allowance for depletion thereof not to exceed the market value in the mine of the product thereof, which has been mined and sold during the year." Thus in the 1916 Act the depletion deductions applied to minerals which were mined and sold.

The Revenue Act of 1918, c. 18, 40 Stat. 1057, sec. 214(a) (10), continued to base the depletion deduction on cost or March 1, 1913 value. It extended the provisions to cover "other natural deposits" and also to cover timber. It established discovery value depletion for mines and oil and gas wells. Significantly, the 1918 Act removed the limitation based upon the market value of the product mined and sold.

The Revenue Act of 1921, c. 136, 42 Stat. 227, secs. 214 and 234, provided that the "depletion allowance *based on discovery value* shall not exceed the *net income*, computed without allowance for depletion, *from the property* * * *."" (Emphasis supplied.) The depletion allowance based on cost or fair market value as of March 1, 1913 was continued, and the net income limitation was not made applicable to the deduction based upon cost depletion.

The Revenue Act of 1924, c. 234, 43 Stat. 253, secs. 204, 214 and 234, made the discovery value depletion subject to a 50% limitation with respect to the net

income from the property, but continued the cost depletion provisions unchanged.

The Revenue Act of 1926, c. 27, 44 Stat. 9, introduced percentage depletion, then applicable only to oil and gas wells, as a simpler and better method of reflecting the increased value of the property which had previously been provided by discovery value depletion. The cost depletion provisions remained unchanged.

Successively in 1932 (c. 209, 47 Stat. 169, sec. 23), 1943 (c. 63, 58 Stat. 21, sec. 124), and 1951 (c. 521, 65 Stat. 452, sec. 319), Congress extended percentage depletion, with varying percentage rates, to additional minerals. Finally in the Internal Revenue Code of 1954, sec. 613 (b) (6), Congress extended percentage depletion to "all other minerals." Section 613(b) (6) specifically provides, however, that " * * * the term 'all other minerals' does not include—(A) soil, sod, dirt, turf, *water*, or mosses; or (B) minerals from sea water, the air, or similar inexhaustible sources." (Emphasis supplied.) There was no similar express exclusion of water from cost depletion.

■ As we read the legislative history, it means no more than that Congress intended depletion as a means of allowing an annual deduction to represent the capital exhausted in the taxpayer's business operations. In cost depletion, we do not agree with the government that "natural deposits" have been equated to "mineral deposits" from which income is derived through severance and sale of the mineral. The language of the cost depletion provisions, sections 611 and 612 of the Internal Revenue Code of 1954, do not convey any such meaning, and it seems to us inconsistent with the purpose and rationale of cost depletion.

The government argues, however, that the exclusion of water from "other minerals" in section 613(b) (6) of the 1954 Internal Revenue Code, applicable to percentage depletion, furnishes strong evidence that water was never intended to be included in "natural deposits" in section 611, applicable to cost depletion. That argument would be more impressive if water had been classed as one of the "inexhaustible resources" in subsection (B) of section 613(b) (6) along with "minerals from sea water" and "the air." The exclusion of water from "other minerals" allowed percentage depletion occurs, however, in subsection (A) along with "soil, sod, dirt, turf, *water*, or mosses." (Emphasis added.) The same contention as applicable to "sod" was ruled against the government in Flona Corporation v. United States, S.D.Fla. 1963, 218 F.Supp. 354, 356. The appeal in that case was docketed in this Court as No. 20981, and was disposed of on April 17, 1964 by an unpublished order quoted in the margin.[1]

[5] Section 1.611–1(d) (5) of the Treasury Regulations on Income Tax (1954 Code) also strongly implies, if indeed it does not definitely recognize, that some minerals may be subject to cost depletion which are not subject to percentage depletion.

"(5) 'Minerals' includes ores of the metals, coal, oil, gas, and all other natural metallic and nonmetallic deposits, except minerals derived from sea water, the air, or from similar inexhaustible sources. *It includes but is not limited to* all of the minerals and other natural deposits subject to depletion based upon a percentage of gross income from the property under section 613 and the regulations thereunder." (Emphasis supplied.)

Certainly that was true until the 1954 Code extended percentage depletion to

1. "PER CURIAM:

"After argument on the motion of the United States. it is ORDERED by the Court:

"1. That the briefs of the United States be treated as withdrawn.

"2. That the appeal by the United States be dismissed.

"3. That the judgment of the District Court be vacated and the cause be remanded for such further proceeding and the entry of such judgment as may appear proper to the District Court."

"all other minerals" [sec. 613(b) (6)]. It remains true, we think, as to the natural deposits listed in exclusion (A) from that extension: "(A) [s]oil, sod, dirt, turf, water, or mosses." However, our decision is limited to the allowance of cost depletion for ground water extracted from the Ogallala water reservoir of the Southern High Plains, "according to the peculiar conditions in each case," sec. 611 of the 1954 Internal Revenue Code. The judgment is accordingly

Affirmed.